# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

Nos. 2020-P-1787, -1794

―――――――――――――――――――――――――――――

United States of America, Appellee

v.

Shelley M. Richmond Joseph, Defendant - Appellant

―――――――――――――――――――――――――――――

United States of America, Appellee

v.

Wesley MacGregor, Defendant - Appellant

―――――――――――――――――――――――――――――

On Appeal From the United States District Court
for the District of Massachusetts in
Case No. 1:19-cr-10141-LTS, Hon. Leo T. Sorokin

―――――――――――――――――――――――――――――

# BRIEF AMICI CURIAE OF LEGAL SCHOLARS IN SUPPORT OF APPELLANTS

―――――――――――――――――――――――――――――

Dated: November 30, 2020     By their attorneys,

Sabin Willett (BBO #542519)
sabin.willett@morganlewis.com
Vanessa M. Brown (BBO #697097)
vanessa.m.brown@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110-1726
+1.617.341.7700

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST OF THE AMICI ...................................................... 1

ARGUMENT .................................................................................................... 2

I.     SUMMARY OF ARGUMENT ................................................................. 2

II.    THE INDICTMENT ESCALATES REPEATED EXECUTIVE
BRANCH ATTEMPTS TO CONSCRIPT STATE AND LOCAL
GOVERNMENT OFFICIALS IN FEDERAL IMMIGRATION
ENFORCEMENT ................................................................................. 4

III.   THE TENTH AMENDMENT CONSTRAINS FEDERAL POWER
TO INDICT STATE JUDICIAL OFFICERS FOR REFUSING TO
COOPERATE WITH IMMIGRATION ENFORCEMENT ...................... 12

     A.    THE TENTH AMENDMENT AND PRINCIPLES OF
CONSTITUTIONAL FEDERALISM CONSTRAIN
FEDERAL PROSECUTIONS OF STATE OFFICIALS FOR
NON-COOPERATION WITH FEDERAL IMMIGRATION
ENFORCEMENT EFFORTS ........................................................ 14

          1.    MANAGEMENT OF STATE COURTHOUSES IS A
POWER RESERVED TO THE STATES BY THE
TENTH AMENDMENT ........................................... 14

          2.    ROOTS OF THE ANTICOMMANDEERING AND
ANTICOERCION DOCTRINES ............................... 17

          3.    DEVELOPMENT OF THE DOCTRINE IN THE
MODERN ERA ...................................................... 18

     B.    COUNTS I-III OF THE INDICTMENT ARE BARRED BY
THE TENTH AMENDMENT ........................................................ 22

CONCLUSION ............................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Arizona v. United States*,
567 U.S. 387 (2012)..................................................................7, 8

*Chief Admin. Justice of the Trial Court v. Labor Relations Comm'n*,
404 Mass. 53, 533 N.E.2d 1313 (1989)......................................15, 23

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) ...............................................10, 11, 20

*City of Chicago v. Sessions*,
321 F.3d 855 (7th Cir. 2018) ...............................................10

*City of Philadelphia v. Attorney Gen. of United States*,
916 F.3d 276 (3d Cir. 2019) ....................................................10, 20

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020)..................................................4, 10, 16

*Cnty. of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017).............................................10

*First Justice of Bristol v. Clerk-Magistrate*,
438 Mass. 387, 780 N.E.2d 908 (2003)......................................15, 23

*Galarza v. Szalczyk*,
745 F.3d 634 (3d Cir. 2014) ....................................................9, 11

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)...............................................................14, 16

*Kelley v. Johnson*,
425 U.S. 238 (1976)....................................................................5

*Lunn v. Commonwealth*,
  477 Mass. 517, 78 N.E. 3d 1143 (2017)...........................................................27

*McDonnell v. United States*,
  136 S. Ct. 2355 (2016)................................................................................14, 20

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  138 S. Ct. 1461 (2018)................................................................................*passim*

*New York v. Barr*,
  951 F.3d 84 (2d Cir. 2020) ........................................................................*passim*

*NFIB v. Sebelius*,
  567 U.S. 519 (2012)......................................................................................13, 19

*Op. of the Justices to the Senate*,
  372 Mass. 883, 363 N.E. 2d 652 (1977)...........................................................15

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984)..............................................................................................26

*Prigg v. Pennsylvania*,
  41 U.S. 539 (1842)...................................................................14, 17, 18, 24

*Printz v. United States*,
  521 U.S. 898 (1997)...................................................................................*passim*

*Ryan v. United States Immigration and Customs Enf't*,
  974 F. 3d 9 (1st Cir. 2020)...................................................................14, 15, 16

*United States v. California*,
  921 F. 3d 865 (9th Cir. 2019) ...................................................................11, 12

*United States v. Lewis*,
  514 F. Supp. 169 (M.D. Pa. 1981)...............................................................19, 20

*United States v. Lopez*,
  514 U.S. 549 (1995)............................................................................................19

*United States v. Tavares*,
844 F.3d 46 (1st Cir. 2016)...............................................20

*United States v. Walker*,
490 F.3d 1282 (11th Cir. 2007) ...............................19, 26

*Vargas v. Swan*,
854 F.2d 1028 (7th Cir. 1988) ...................................8

**STATUTES**

8 U.S.C. § 1103(a)(10)........................................................7

8 U.S.C. § 1252(c) .............................................................7

8 U.S.C. § 1357(d) .............................................................6

8 U.S.C. § 1357(g) .............................................................6

8 U.S.C. § 1373....................................................11, 20

Act of Feb. 12, 1793, ch. VII, 1 Stat. 302 (1793)....................17

Anti-Drug Abuse Act of 1986,
Pub. L. No. 99-570, § 1751, 100 Stat. 3207 (Oct. 27, 1986) ...........6

Anti-Drug Abuse Act of 1988,
Pub. L. No. 100-690, §§ 7342-43,
102 Stat. 4469-70 (Nov. 18, 1988) ...................................6

Exec. Order No.13768,
82 Fed. Reg. 8799 (Jan. 25, 2017)....................................9

Immigration and Naturalization Act Section 287(g) ...................6

Narcotics Traffickers Deportation Act ..................................6

OTHER AUTHORITIES

Alina Das, *Inclusive Immigrant Justice: Racial Animus and the
    Origins of Crime-Based Deportation,*
    52 U.C. Davis L. Rev. 171 (2018)........................................................7

César Cuauhtémoc García Hernández, *Creating Crimmigration*,
    2013 BYU L. REV. 1457 (2013)..........................................................7

Christopher N. Lasch, R. Linus Chan, Ingrid V. Eagly,
    Dina Francesca Haynes, Annie Lai, Elizabeth M. McCormick &
    Juliet P. Stumpf, *Understanding "Sanctuary Cities,"*
    59 B.C. L. REV. 1703 (2018) .............................................................5

Christopher N. Lasch, *Rendition Resistance*,
    92 N.C. L. REV. 149 (2013)....................................................8, 17, 18

Dep't of Homeland Sec., Form I-247A (March 2017),
    https://www.ice.gov/sites/default/files/documents/Document/2017/
    I-247A.pdf.........................................................................................9

Herman Melville, *Bartleby the Scrivener: A Story of Wall-Street*,
    The Piazza Tales (1856) ...................................................................13

ICE Policy No. 10074.2, ¶2.4 (Mar. 24, 2017, eff. Apr. 2, 2017),
    https://www.ice.gov/sites/default/files/documents/Document/2017/
    10074-2.pdf.......................................................................................9

Ilya Somin, *Making Federalism Great Again: How the Trump
    Administration's Attack on Sanctuary Cities Unintentionally
    Strengthened Judicial Protection for State Autonomy,*
    97 Tex. L. Rev. 1247 (2019) ............................................................11

Jennifer M. Chacón, *Unsecured Borders: Immigration Restrictions,
    Crime Control, and National Security*,
    39 CONN. L. REV. 1827 (2007)............................................................7

Juliet Stumpf, *The Crimmigration Crisis: Immigrants, Crime, and Sovereign Power*, 56 AM. U. L. REV. 367 (2006)...............................................6

Karthick Ramakrishnan & Pratheepan Gulasekaram, *The Importance of the Political in Immigration Federalism,* 44 ARIZ. ST. L.J. 1431 (2012) .............................................................7

Letter from Tani G. Cantil-Sakauye, Chief Justice, Cal. Supreme Court, to Jeff Sessions, U.S. Attorney Gen. (Mar. 16, 2017), http://newsroom.courts.ca.gov/news/chief-justice-cantil-sakauye-objects-to-immigration-enforcement-tactics-at-california-courthouses ...........................................................................................9

Michael J. Wishnie, *State and Local Police Enforcement of Immigration Laws,* 6 U. PA. J. CONST. L. 1084 (2004) ......................................7

R. Seth Davis, *Conditional Preemption, Commandeering, and the Values of Cooperative Federalism*, 108 Colum. L. Rev. 404 (2008) ...............21

Sally E. Hadden, *Slave Patrols: Law and Violence in Virginia and the Carolinas* (Harv. Univ. P. 2001) ...............................................................17, 18

Tani G. Cantil-Sakauye, Chief Justice, Cal. Supreme Court (Mar. 29, 2017), http://assets.documentcloud.org/documents/3533530/Attorney-General-and-Homeland-Security-Secretary.pdf................................................10

## STATEMENT OF INTEREST OF THE AMICI

*Amici,* Professors Jennifer M. Chacón, Linus Chan, Erwin Chemerinsky, Alina Das, Seth Davis, César Cuauhtémoc García Hernández, Dina Francesca Haynes, Anne Lai, Christopher N. Lasch, Elizabeth McCormick, Ilya Somin, and Michael J. Wishnie (whose appointments are listed in Appendix A), are scholars of constitutional, immigration and criminal law, and in particular of the relationship between state and federal powers under our federal system. They have a professional interest in the development of the law implicated by the Indictment.[1] Believing that their historical perspective will assist the Court's review of the significant constitutional questions presented by this appeal, *amici* submit this Brief Amici Curiae in support of the Appellants' requests for relief as to Counts I-III of the Indictment.[2]

---

[1] Here and throughout, *amici* adopt terms defined in the Appellant Judge Shelley M. Richmond Joseph's Opening Brief.

[2] The parties have assented to the filing of this brief. No counsel for a party authored this brief in whole or in part and no person or entity, other than *amici curiae* and their counsel, has contributed money that was intended to fund preparing or submitting the brief.

# ARGUMENT

## I.     SUMMARY OF ARGUMENT

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. Am. X. *Amici* write to point out that in this case, the Executive branch violated the Tenth Amendment by indicting the Appellants[3] for conduct carried out in their exercise of power reserved to the Commonwealth of Massachusetts. Because the pendency of the Indictment continues to infringe rights secured by that amendment, *amici* submit that the Indictment should have been dismissed below.

The district court did not address the merits of Appellants' Tenth Amendment challenge, reasoning that it "require[d] the assessment of disputed facts, characterizations of the events underlying the Indictment." *See* ADD6-7. *Amici* submit that the district court's view was incorrect. Review – which is limited to the government's allegations, and requires, at this stage of the proceeding, that they be accepted as true – discloses no "disputed facts or characterizations of the events." Accepted as true, the government's allegations show that its prosecution is a

---

[3] Newton District Court Judge Joseph (No. 2020-P-1787), and Court Officer Wesley MacGregor (No. 2020-P-1794).

2

constitutionally-impermissible effort to commandeer and coerce Appellants – and other judicial officers – through the fact and threat of its power to prosecute.

The mere pendency of the Indictment creates the very thing the Constitution forbids – a severe and present consequence for declining to be "pressed into federal service." *See Printz v. United States*, 521 U.S. 898, 905 (1997). *Amici* show below that the jeopardy faced by the Appellants is now manifest to every judicial officer in every state. Under the Tenth Amendment, a state judge should never be put to the dilemma of becoming either a conscript to federal policy objectives or a defendant in a federal prosecution. So long as the Indictment in these cases persists, so too will that apprehension of jeopardy for thousands of other state judicial officers.

In Section II of the argument, *amici* explore the context from which this controversy emerged: acceleration of Executive branch efforts to commandeer state and local officials in federal immigration enforcement efforts, followed by a growing frustration as these efforts were largely rejected by courts. That context of frustration led, in early 2019, to a bolder gambit: the Executive's launch of a criminal prosecution.

Section III of the Argument shows that management of state courthouses is of the essence of the sovereign judicial power reserved to the states. It traces the development of the anticommandeering doctrine, showing that the attempt to

commandeer states in the exercise of that power violates the Tenth Amendment. In *Printz*, one example of many, the Supreme Court held that the federal government may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." 521 U.S. at 935. Other cases have made clear that all forms of commandeering – whether by command, prescription, or criminal sanction – are unconstitutional.

Turning to the Indictment, Section III shows that all acts alleged by the government come squarely within the reserved power to manage the courthouse, and thus that the Indictment is a clear violation of the Tenth Amendment.

## II.     THE INDICTMENT ESCALATES REPEATED EXECUTIVE BRANCH ATTEMPTS TO CONSCRIPT STATE AND LOCAL GOVERNMENT OFFICIALS IN FEDERAL IMMIGRATION ENFORCEMENT.

The Indictment did not arise in a vacuum. With increasing aggression, the government sought in recent years to harness state and local criminal justice systems in service of federal immigration enforcement. Its efforts accelerated in 2017, when it deployed a series of measures to coerce so-called "sanctuary cities" into cooperating with federal enforcement efforts. This program largely failed in the courts. *See generally, City of Providence v. Barr*, 954 F. 3d 23, 28-30 (1st Cir. 2020) (summarizing the travel of the "sanctuary city" cases). In April 2019, frustrated by

a series of judicial setbacks, the Executive branch dropped its gloves. Instead of coercing state cooperation through economic means, it would deploy its criminal powers, and begin making an example of local judges who might dare to decline cooperation.

State and local entanglement in immigration enforcement is a recent phenomenon.[4] For more than a century, a clear line sharply separated the spheres of responsibility of state and local law enforcement agencies and federal immigration enforcement authorities. While state and local officials bear much of the responsibility for the administration of criminal laws, *see Kelley v. Johnson*, 425 U.S. 238, 247 (1976) ("[t]he promotion of safety of persons and property [has been] unquestionably at the core of the States' police power [reserved by the Tenth Amendment.]"), immigration enforcement had long been the province of federal officials.

In the 1980s and 1990s, pressing a narrative of immigrant criminality, Congress began to draw immigration enforcement within the ambit of broadened

---

[4] *See generally,* Christopher N. Lasch, R. Linus Chan, Ingrid V. Eagly, Dina Francesca Haynes, Annie Lai, Elizabeth M. McCormick & Juliet P. Stumpf, *Understanding "Sanctuary Cities,"* 59 B.C. L. REV. 1703 (2018).

federal criminal drug laws.[5] In 1986, Congress enacted the Narcotics Traffickers Deportation Act, expanding the categories of individuals who could be removed for controlled substance convictions. *See* Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1751, 100 Stat. 3207 (Oct. 27, 1986). Two years later, Congress made the commission of newly created "aggravated felonies" grounds for removal. *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, §§ 7342-43, 102 Stat. 4469-70 (Nov. 18, 1988). Around this time, Congress introduced the first statutory reference to an immigration detainer. *See* Anti-Drug Abuse Act of 1986, *supra*, § 1751(d) (creating 8 U.S.C. § 1357(d)).

While early enactments implicated state and local law enforcement only indirectly, later enactments empowered state and local actors to participate, in a limited way, in direct immigration enforcement. In 1996, Congress added Section 287(g) to the INA, allowing the Attorney General to enter into agreements with states or localities *choosing* to allow their officers to carry out the "function of an immigration officer." 8 U.S.C. § 1357(g). Congress also authorized states and localities to permit their officers to make civil immigration arrests in certain narrow

---

[5] *See generally,* Juliet Stumpf, *The Crimmigration Crisis: Immigrants, Crime, and Sovereign Power*, 56 AM. U. L. REV. 367 (2006).

instances, *see* 8 U.S.C. §§ 1252(c); 1103(a)(10). The 1996 enactments did not *require* the assistance of states and localities in immigration enforcement, however.

The 9/11 attacks inspired a new view of unlawful immigration as not simply a criminal, but a national security concern.[6] The Executive began to discern in state and local law enforcement agencies a potential "force multiplier," and pushed more insistently to involve state actors in enforcement.[7] The narrative linking immigration and crime suggested that "states and cities could and should be part of the solution," and that local police should enforce the immigration laws.[8]

The notion that state and local actors have inherent authority to enforce federal immigration policy was discredited in *Arizona v. United States*, 567 U.S. 387, 400

---

[6] *See* César Cuauhtémoc García Hernández, *Creating Crimmigration*, 2013 BYU L. REV. 1457, 1458 (2013); Jennifer M. Chacón, *Unsecured Borders: Immigration Restrictions, Crime Control, and National Security*, 39 CONN. L. REV. 1827 (2007).

[7] *See, e.g.,* Michael J. Wishnie, *State and Local Police Enforcement of Immigration Laws,* 6 U. PA. J. CONST. L. 1084, 1084-88 (2004).

[8] Karthick Ramakrishnan & Pratheepan Gulasekaram, *The Importance of the Political in Immigration Federalism,* 44 ARIZ. ST. L.J. 1431, 1475 (2012); *see also* Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of Crime-Based Deportation,* 52 U.C. Davis L. Rev. 171 (2018) (noting the expanded role envisioned for state and local law enforcement officers in immigration enforcement).

(2012). Pointing to the "limited circumstances" in which Congress had allowed state and local officers to make civil immigration arrests, the Court held that Arizona's attempt (premised on the "inherent authority" argument) to authorize state and local participation beyond the "system Congress created" violated the Supremacy Clause. *Id.* at 408-10 (citations omitted).

This recent period saw exponential growth in the use of federal immigration detainers as an enforcement mechanism.[9] After the launch of the "Secure Communities" immigration enforcement program in 2008, federal immigration officials flooded state and local officials with detainers. *See* TRANSACTIONAL RECORDS ACCESS CLEARINGHOUSE, LATEST DATA: IMMIGRATION AND CUSTOMS ENFORCEMENT DETAINERS (data tool available online at https://trac.syr.edu/phptools/immigration/detain/) (tracing rise in annual issuances of detainers from 10,000 prior to FY 2006 to over 300,000 in FY 2011). Hundreds of thousands of detainers commanding detention were issued until 2014, when the

---

[9] An immigration detainer is a form purporting to command or request receiving jail officials to prolong the detention of a person entitled to release because of a suspected immigration violation. *See* Christopher N. Lasch, *Rendition Resistance*, 92 N.C. L. REV. 149, 205–09 (2013). Prior to April 1997, the form detainer in use by federal immigration officials did not even request detention. *See Vargas v. Swan*, 854 F.2d 1028, 1035 (7th Cir. 1988) (appendix showing Form I-247 in use from March 1983 to April 1997).

Third Circuit Court of Appeals held that mandatory detainer compliance was not authorized by the INA and would violate the Tenth Amendment's anticommandeering doctrine.[10]

Early in 2017, executive efforts to commandeer states in immigration enforcement accelerated. The President issued an executive order aimed at "ending" so-called "sanctuary cities" by starving them of federal funds. Exec. Order No. 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017). When state-court judges expressed concern regarding the deleterious impact of arrests upon access to justice,[11] the Executive responded with evident frustration, claiming that the arrests were necessitated by "[state and local] statutes and ordinances designed to specifically prohibit or hinder ICE from enforcing immigration law by prohibiting communication with ICE, and denying requests by ICE officers and agents to enter

---

[10] *Galarza v. Szalczyk*, 745 F.3d 634, 641-45 (3d Cir. 2014). Under the current administration's approach to Secure Communities, detention is regularly requested. ICE Policy No. 10074.2, ¶2.4 (Mar. 24, 2017, eff. Apr. 2, 2017), https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf; Dep't of Homeland Sec., Form I-247A (March 2017), https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

[11] *E.g.,* Letter from Tani G. Cantil-Sakauye, Chief Justice, Cal. Supreme Court, to Jeff Sessions, U.S. Attorney Gen. (Mar. 16, 2017), http://newsroom.courts.ca.gov/news/chief-justice-cantil-sakauye-objects-to-immigration-enforcement-tactics-at-california-courthouses.

prisons and jails to make arrests."[12] Chronic constitutional infringement ensued, as courts began to check the Executive. The February 2017 executive order was promptly enjoined on Tenth Amendment and Spending Clause grounds. *Cnty. of Santa Clara v. Trump,* 250 F. Supp. 3d 497, 530-33 (N.D. Cal. 2017), *reconsideration denied,* 267 F. Supp. 3d 1201 (N.D. Cal. 2017), *appeal dismissed as moot sub nom. City & Cnty. of San Francisco v. Trump,* 17-16886, 2018 WL 1401847 (9th Cir. Jan. 4, 2018). Undeterred, the Executive sought to impose funding conditions through certification requirements on law enforcement grants. These conditions were enjoined by almost every court that reviewed them. *See City of Providence*, 954 F.3d at 27, 45 (affirming an injunction); *City of Chicago v. Barr,* 961 F.3d 882 (7th Cir. 2020) (affirming permanent injunction); *City of Philadelphia v. Attorney Gen. of United States*, 916 F.3d 276, 279 (3d Cir. 2019) (invalidating grant conditions imposed by the DOJ); *City of Chicago v. Sessions,* 321 F.3d 855 (7th Cir. 2018) (affirming preliminary injunction); *but see New York v. Barr*, 951 F.3d 84, 123-24 (2d Cir. 2020) (upholding grant conditions). Some

---

[12] Letter from Jefferson B. Sessions III, Att'y Gen., & John F. Kelly, Sec'y, Dep't of Homeland Sec., to Tani G. Cantil-Sakauye, Chief Justice, Cal. Supreme Court, at 2 (Mar. 29, 2017), http://assets.documentcloud.org/documents/3533530/Attorney-General-and-Homeland-Security-Secretary.pdf.

courts held that one requirement—that non-federal jurisdictions certify that they have not limited officials from sharing immigration-status-related information with federal officials, *see* 8 U.S.C. § 1373—violated the Tenth Amendment's anticommandeering principle by "conscript[ing] the police forces of the state or local governments to achieve its ends." *City of Chicago,* 961 F.3d at 892.[13]

The Executive then sued to enjoin parts of California's Senate Bill 54, challenging provisions that prohibited disclosure to federal authorities of certain inmate release and transfer information, and the transfer of inmates absent a judicial warrant or probable cause determination.[14] The Ninth Circuit denied an injunction, holding that California was likely to succeed on both challenges based on Tenth Amendment anticommandeering principles. *United States v. California,* 921 F.3d 865 (9th Cir. 2019), *cert. denied*, 2020 WL 3146844 (U.S. June 15, 2020). The court held that while California's limitations on disclosure might frustrate the United

---

[13] For a 2019 review of failed Executive attempts to enlist state and local officers in immigration enforcement by means of grant conditions, *see* Ilya Somin, *Making Federalism Great Again: How the Trump Administration's Attack on Sanctuary Cities Unintentionally Strengthened Judicial Protection for State Autonomy,* 97 Tex. L. Rev. 1247 (2019).

[14] The government did not challenge a provision of SB54 prohibiting detainer-based detention, tacitly acknowledging that the Tenth Amendment would prevent such a challenge. *See Galarza,* 745 F.3d at 641-42.

States, "that frustration is permissible, because California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts." *Id.* at 890-91. As to inmate transfer, the Court observed, "Federal law provides states and localities the *option,* not the *requirement,* of assisting federal immigration authorities." *Id.* at 886-90.

The Indictment is rooted in this historical soil. After so many failed economic efforts to conscript state criminal systems for federal immigration enforcement, the Executive deployed its power to indict.

## III. THE TENTH AMENDMENT CONSTRAINS FEDERAL POWER TO INDICT STATE JUDICIAL OFFICERS FOR REFUSING TO COOPERATE WITH IMMIGRATION ENFORCEMENT.

The Tenth Amendment limits the federal government's power to intrude upon powers reserved to the Commonwealth of Massachusetts. All sovereign powers of the Commonwealth "not delegated to the United States by the Constitution, nor prohibited by it to [Massachusetts] are reserved to [Massachusetts], or to the people." U.S. Const. Am. X.[15]

_____

[15] This case presents no question under the Supremacy Clause, U.S. Const. Art. VI, cl. 2. The Supremacy Clause grants "supremacy" only to the Constitution itself (which includes the safeguard of the Tenth Amendment), and to federal laws

The shield of the Tenth Amendment takes shape, in part, in the "anticommandeering doctrine:" the rule that prohibits the federal government from seeking to commandeer states, or state officials, in carrying out federal policy. "Commandeering" may take different forms. The Executive Branch may not "*command* the States' officers … to administer or enforce a federal regulatory program," *Printz,* 521 U.S. at 935 (emphasis added). Nor may it *coerce* them. *NFIB v. Sibelius*, 567 U.S. 519 (2012). Nor may it *prohibit* the state, or its officials, from taking actions that otherwise lie within their sovereign power. *Murphy v. NCAA*, 138 S. Ct. 1461 (2018). All forms of federal intrusion into sovereign powers reserved to the states are barred.

The federal government often chafes at this limit. Just as Bartleby vexed associates by repeating, "I would prefer not to,"[16] cities and states often frustrate federal policy makers by declining to be pressed into federal service. This arises in many contexts, from gambling (*Murphy*) to firearm registries (*Printz*) to immigration policy. But Bartleby's preference, a cherished constitutional safeguard,

---

and treaties enacted pursuant thereto. U.S. Const. Art. VI, cl. 2. An exercise of executive power that *offends* the Tenth Amendment can enjoy no "supremacy."

[16] *See generally*, Herman Melville, *Bartleby the Scrivener: A Story of Wall-Street*, in The Piazza Tales (1856).

was recognized long ago in *Prigg v. Commonwealth of Pennsylvania*, 41 U.S. 539 (1842), and has been reaffirmed ever since. The rule enhances freedom by preserving the States as "independent political entities" and ensuring a "healthy balance of power between the States and the Federal Government." *Printz,* 521 U.S. at 919, 921 (internal quotation marks omitted).

A. **The Tenth Amendment and Principles of Constitutional Federalism Constrain Federal Prosecutions of State Officials For Non-Cooperation with Federal Immigration Enforcement Efforts.**

1. **Management of state courthouses is a power reserved to the States by the Tenth Amendment.**

"A State defines itself as a sovereign through 'the structure of its government, and the character of those who exercise government authority.'" *McDonnell v. United States*, 136 S. Ct. 2355, 2373 (2016), quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Among Massachusetts's sovereign powers is its "Judiciary Power." *See* Mass. Const. Pt. III, art. 1. Three months ago, in *Ryan v. United States Immigration and Customs Enforcement*, 974 F.3d 9, 29 (1st Cir. 2020), this Court noted the "uncontroversial premise" that "the operation of a functioning judiciary is unmistakably a fundamental exercise of state sovereignty."

The "operation" of the Massachusetts judiciary is not limited to deciding cases. A core attribute of the judiciary's operations is administrative and practical:

control over the places where judicial activities take place. *Chief Admin. Justice of the Trial Court v. Labor Relations Comm'n*, 404 Mass. 53, 57, 533 N.E.2d 1313, 1317 (1989); *see also, First Justice of Bristol v. Clerk-Magistrate*, 438 Mass. 387, 397, 780 N.E.2d 908, 916 (2003). This power to control the courthouse is "'absolutely necessary for a court to function effectively.'" *Labor Relations Comm'n*, 404 Mass. at 57 (quoting *State v. LaFrance*, 471 A.2d 340, 345 (N.H. 1983)). The "least controversial" of judicial powers, *see First Justice*, 438 Mass. at 397, 780 N.E.2d at 916, the power to control the courthouse "must be vested in the judiciary if the courts are to provide justice, and the people are to be secure in their rights." *Op. of the Justices to the Senate*, 372 Mass. 883, 893, 363 N.E. 2d 652, 659 (1977) (quoting *O'Coin's Inc. v. Treasurer of the Cnty. of Worcester*, 362 Mass. 507, 510, 287 N.E. 2d 608, 611 (1972)). In short, power to manage state courthouses in ordinary state prosecutions is reserved to Massachusetts and the other states, and exercised by their judicial officers.

*Ryan* held that no common-law privilege supplants the statutory power of federal immigration authorities to make civil arrests in state court environs. Of interest here is the court's treatment of a theory of statutory construction that it described as the "federalism," or "clear statement" canon, and which led to a remand. Absent a clear statement of intent to invoke its powers under the Supremacy Clause,

15

Congress should not be deemed to have intended to contravene state policy. *Ryan*, 974 F.3d at 29, *citing to Gregory*, 501 U.S. at 458 (a "healthy balance of power between the States and the Federal Government [reduces] the risk of tyranny and abuse from either front"); *see also City of Providence*, 954 F.3d at 45 ("When the federal government deals with state and local governments, it must turn square corners."). The Court could not determine whether a federal arrest in a state courthouse actually would interfere with Massachusetts' "sovereign power to operate its judiciary," because the record left unclear whether Massachusetts policy would be offended by such an arrest. 974 F.3d at 30. But the Court's premise in *Ryan* was that conduct occurring in courthouse *corridors* falls within the "operation of the judiciary."[17] *A fortiori*, a judge's administration of a case *from the bench* is within the "operation of a functioning judiciary" that the Court described as "unmistakably a fundamental exercise of state sovereignty." *Ryan*, 974 F.3d at 30.

---

[17] "Against this backdrop, we assume — solely for purposes of this appeal — that a decision by Massachusetts to prohibit at least some courthouse arrests would represent an exercise of the Commonwealth's sovereign power to operate its judiciary…." *Ryan*, 974 F.3d at 30.

## 2.    Roots of the Anticommandeering and Anticoercion Doctrines.

The Indictment contains an eerie echo to *Prigg v. Commonwealth of Pennsylvania*, 41 U.S. 539 (1842), the case that recognized just how important a state's right to decline cooperation could be. From the first days of the republic, Art. IV, §3 of the Constitution and a federal enabling statute[18] set up a tension between federal and state power. These provisions authorized the seizure, in states where slavery was illegal and abhorrent, of formerly enslaved persons, and enforced their return to servitude in the states from which they had escaped. *See generally*, Lasch, *Rendition Resistance*, supra n. 9; Sally E. Hadden, *Slave Patrols: Law and Violence in Virginia and the Carolinas* (Harv. Univ. P. 2001). The states resisted; seeking to protect their new citizens, many states enacted criminal sanctions on so-called "slave catchers." Matters came to a head when Edward Prigg was indicted in Pennsylvania for kidnapping Margaret Morgan and transporting her to slavery in Maryland, five years after her escape to freedom.[19] Prigg was convicted in Pennsylvania under a

---

[18]Act of Feb. 12, 1793, ch. VII, 1 Stat. 302 (1793). The act addressed both fugitives from justice and fugitives from slavery.

[19] In 1832, Morgan moved from Maryland to Pennsylvania – apparently without hindrance. Her owner John Ashmore granted her virtually full freedom. Because Morgan was never formally emancipated, Ashmore's heir Margaret Ashmore claimed ownership, and hired Prigg to recapture her. Morgan was then

state kidnapping statute, and his conviction was affirmed by the highest court in Pennsylvania. *Id.*

The Supreme Court reversed, holding that Pennsylvania had no power to obstruct an arrest carried out in aid of a federal statute squarely within Constitutional boundaries. Still, Justice Story drew a careful line between federal and state power. "It might well be deemed an unconstitutional exercise of the power of interpretation [of the Constitution]," he wrote, "to insist that the states are bound to provide means to carry into effect the duties of the national government, nowhere delegated or intrusted to them by the constitution." *Prigg*, 41 U.S. at 541. Thus, even where the Constitution *itself* authorizes a federal practice, states might decline to participate in it. "[T]he prevailing view in *Prigg* was that even if Congress could legislate on the subject, it could not compel the performance of a duty by state officials." Lasch, 92 N.C. L. Rev. at 177.

### 3. Development of the Doctrine in the Modern Era.

The broader proposition advanced in *Prigg* has regularly been reaffirmed. In recent cases, the Supreme Court has described this limitation on federal power as a

---

living in York County, Pennsylvania, with her Pennsylvania-born children. Prigg seized Morgan and the children in 1837, and returned them to Maryland. *See* Lasch, 92 N.C. L. REV. at 174-75.

"fundamental structural decision incorporated into the Constitution, i.e., the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*, 138 S. Ct. at 1475. States have the prerogative "not [to] yield[ ] to federal blandishments when they do not want to embrace the federal policies as their own." *Sebelius*, 567 U.S. at 579 (internal quotation omitted).

Thus the Tenth Amendment and the structural principle of constitutional federalism that it reflects bar the federal government from intruding – *at all* -- upon this reserved power to operate the judiciary– never mind by criminalizing it. *See Printz*, 521 U.S. at 931-32 (anticommandeering rule); *Sebelius*, 567 U.S. at 585 (anticoercion rule). The amendment constrains federal criminal prosecutions of state judicial officers in various ways. *United States v. Walker*, 490 F.3d 1282, 1299 (11th Cir. 2007), held that federal prosecutions may not aim to "instruct state officials on how to conform their conduct to state law, because this power is reserved to the states." The government may not prosecute an individual for conduct that Congress lacks authority to regulate. *See United States v. Lopez*, 514 U.S. 549, 567-68 (1995). Nor may the federal government use the threat of prosecution to commandeer or coerce a state official into carrying out federal policy. *Printz*, 521 U.S. at 935. A federal criminal statute "must not be construed to permit unwarranted federal intervention into the affairs of state government." *United States v. Lewis*, 514 F.

19

Supp. 169, 176 (M.D. Pa. 1981); *see McDonnell*, 136 S. Ct. at 2373 (declining "to construe [a] statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of good government for local and state officials") (internal citations omitted); *United States v. Tavares*, 844 F.3d 46, 54 (1st Cir. 2016) (citing federalism concerns in concluding that "Government has not in fact demonstrated that the conduct satisfies the appropriate criminal statutes").

This anticommandeering rule bars the federal government from attaching criminal sanctions when a state officer declines to be pressed into service of a federal policy objective. In *Printz*, for example, the Brady Handgun Violence Prevention Act required local municipal officials to conduct background checks on handgun purchasers, and imposed a criminal sanction for violations. 521 U.S. at 904. The Court held that portion of the statute violated the Tenth Amendment because the federal government could not "conscript[] the State's officers directly." *Id*. at 935. Courts have recently applied the anticommandeering doctrine in the immigration context in *City of Chicago*, 961 F.3d 882, and *City of Philadelphia*, 916 F.3d 276. These decisions enjoined enforcement of portions of sections 1373(a) and 1373(b) of the INA, which barred states from restricting state officials from providing

information to INS and sharing information among state and federal law enforcement.

The anticommandeering ban extends to indirect commands that deny state officials the option of refusing to participate in a federal scheme. *See* R. Seth Davis, *Conditional Preemption, Commandeering, and the Values of Cooperative Federalism*, 108 Colum. L. Rev. 404, 417-19 (2008). In *New York v. United States*, a federal statute gave states an "election" between accepting radioactive waste from producers or implementing regulations outlined by Congress. This, the Court held, was a Hobson's choice, functionally a direct command that the states implement federal regulations. *New York*, 505 U.S. at 176, 188. In *Murphy*, the Court found no distinction between laws that direct states to act, as in *Printz*, and laws that prohibit them from acting. In short, just as federal authorities may not constitutionally order a state officer to cooperate in an immigration arrest, so too are they barred from punishing an officer for failing to cooperate. Each approach is "unconstitutionally coercive," *see New York*, 505 U.S. at 176, and the exercise of criminal indictment powers the more so. Each approach "unequivocally dictates" what a State, acting through its officials, "may and may not do." *Murphy*, 138 S. Ct. at 1478. Each is an attempt to regulate the States, through coercion applied to state officials. *See New York*, 505 U.S. at 166 (noting that "the Framers explicitly chose

21

a Constitution that confers upon Congress the power to regulate individuals, not States"). If the criminal sanctions in *Printz* violated the Tenth Amendment, *a fortiori*, the Constitution prohibits the federal executive branch from coercing state judicial officers through the example of an actual criminal prosecution.

## B. Counts I-III of the Indictment are Barred by the Tenth Amendment.

Counts I-III of the Indictment allege conduct during a hearing in the Newton District Court, involving one "A.S." *See* A16-38 (Indictment) at ¶6. After a Massachusetts prosecutor dropped the only charge that might have warranted pre-trial detention under Massachusetts law, at a point when Judge Joseph was advised that the Commonwealth did not seek to detain A.S. in connection with the remaining charge, A21-22 ¶¶17, 22, Judge Joseph, while on the bench, conversed with the prosecutor and defense counsel. *See id.* ¶20. The government asserts that she became party to an arrangement pursuant to which A.S. would leave the courtroom and the courthouse via a rear door following the hearing. A23-26, ¶¶22-23, 27. The Indictment suggests as well that Judge Joseph and Officer MacGregor knew that this means of egress was contrary to the expectation of a federal agent then in the courthouse lobby (whom the judge had previously excused from the courtroom, *see* A21-22 (Indictment) ¶¶19-22), but does not allege that either Appellant affirmatively misrepresented anything to the agent. It alleges that Judge Joseph

deactivated an official recording device during a portion of that proceeding, A23, 26 ¶¶21, 29, and that Officer MacGregor assisted A.S. in exiting the building. *Id.* ¶¶20-21. There is no allegation that either Appellant impeded any federal effort to detain A.S. outside the courthouse or otherwise pursue its removal powers under federal law.

In short, Counts I-III allege uncooperative conduct of a Massachusetts judge in administering a Massachusetts criminal case from the bench of her Massachusetts courtroom, and of a court officer who assisted in that case administration. All of the acts charged are alleged to have taken place in a courthouse erected by the Commonwealth, at its own expense, for the purpose of administering Massachusetts cases, and to have been carried out by judicial officers who were, at the time, administering a criminal case arising under Massachusetts law. Each act, if it occurred as alleged, fell squarely within powers reserved to Massachusetts by the Constitution itself. Each involved the "conduct of participants" in a state court process, *see First Justice*, 438 Mass. at 398, 780 N.E.2d at 916, the "actions of officers of the court," *id.*, and the "environment of the court[room]." *Id.* Counts I-III charge as criminal a judge's "physical control" of that environment. *Chief Admin. Justice*, 404 Mass. at 57, 533 N.E.2d at 1317. Arising within a context so central to the reserved judicial powers of Massachusetts, Counts I-III of the Indictment

represent an overt effort to coerce, commandeer, and indeed intimidate all states, and all judicial officers, into cooperation with federal immigration enforcement by severely punishing the Appellants for their noncooperation.

The government charges that the unlawful object of the alleged conspiracy was "to attempt to obstruct, influence, and impede the official ICE federal removal proceeding, by preventing the ICE Officer from taking custody of A.S. at the Newton District Court Courthouse." *See* A26 (Indictment) ¶25 (emphasis added). It may be, as Appellants posit, *see* Op. Brf. at 32, that the district court thought that Appellants' motives might be relevant. If so, that was plainly error. The exercise by a state judicial officer of a power reserved to the states under the Tenth Amendment cannot become criminal because it was undertaken for what the government thinks is a bad motive. Pennsylvania's motive in *Prigg* was plainly obstructive: its legislature and courts wanted to do everything possible to thwart the appellant's constitutional right to kidnap formerly enslaved persons. Yet that was no warrant, under Justice Story's dictum, to criminalize the noncooperation of state actors. Sheriff Printz's motives were similarly irrelevant. Whether his objection to handgun registration was the added paperwork, a desire to sabotage Congress's policy objective, or simply that he "preferred not to," the Tenth Amendment flatly

banned the federal government from pressing him into the service of its policy. *See Printz*, 521 U.S. at 935.

In short, a Massachusetts' judge's constitutional right to manage her courtroom does not depend on her views on immigration. A federal arrest could be "obstructed" by a rear-door departure to a public parking lot only if the federal government had a legally-enforceable right to direct ingress and egress from Massachusetts court proceedings in the first place, and it does not. As *Murphy*, *Printz*, and *New York* all show, the government's premise, that it can, through the threat of criminal prosecution, commandeer state facilities and coerce state actors in order to make immigration arrests, is precisely what the Tenth Amendment forbids.[20]

The Indictment alleges that Judge Joseph's conduct violated various Massachusetts standards, including standards set out in an administrative memorandum, and rules relating to the recording of proceedings. A20 (Indictment)

---

[20] The government's effort upends a core rationale of the Tenth Amendment, that the federal government cannot shift the cost of policy enforcement on the states. The effect of this prosecution is to commandeer courthouses built and maintained by Massachusetts as centers for its enforcement policy, and to force the judicial officers whom Massachusetts appoints to assist in effectuating that policy. A key policy objective of the Tenth Amendment is to force the federal government to finance its own initiatives, rather than shifting that cost to the States. *See Murphy*, 138 S. Ct. at 1477.

¶¶12–13.  Whether that is so may warrant review by the appropriate agencies of Massachusetts, but the Tenth Amendment makes such concerns no business of the federal government.[21]  As the Eleventh Circuit explained, federal prosecutions may not aim to "instruct state officials on how to conform their conduct to state law, because this power is reserved to the states."  *Walker*, 490 F.3d at 1299 (explaining that federal prosecution may not be predicated on a non-criminal state ethics provision).  The Supreme Court has put the basic principle plainly: "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). In reality, Appellants are charged with acting neutrally.  Consistent with the policy of the Tenth Amendment, Defendants neither permitted the judicial proceeding to become a tool of federal enforcement, nor in any way restricted the federal government in its efforts to enforce the immigration laws outside the courthouse.

A ruling that permitted the government to continue to prosecute these Appellants would raise two additional, practical concerns.  The first involves an

---

[21] There is no suggestion that the failure to tape-record proceedings impeded the federal government from making an arrest.  Neither federal agents nor anyone else would have had access to tape recordings prior to A.S.'s departure.

arguable departure from Massachusetts law. *Lunn v. Commonwealth*, 477 Mass. 517, 78 N.E. 3d 1143 (2017). Once the assistant district attorney dropped the fugitive charge, A21, 23 (Indictment) ¶¶17, 22, there was no basis in Massachusetts law upon which Judge Joseph might have held A.S. In *Lunn*, a court officer arrested an alleged alien after dismissal of his state case, and briefly held him for federal ICE officers. The SJC held that arrest unlawful. Notwithstanding the pendency of a detainer, once the criminal case was resolved, the fact that the federal government was requesting that the defendant be held conferred on state officers no power even of brief arrest. As a Massachusetts judicial officer, Judge Joseph was bound to comply with *Lunn*. Given that she exercised the Judiciary Power of the Commonwealth over her courtroom, she plainly had power to permit egress from any of the courthouse's exits. Forcing the defendant through the public entrance would raise an arguable violation of the *Lunn* ruling. That the government's theory raises concerns under operative state law highlights the constitutional problem at the center of the case: that the United States seeks to supplant state power in service of federal policy objectives.

*Amici* have shown that when a judge permits a defendant's ingress or egress from the courtroom or directs the operation of a recording device, she engages in a quintessentially judicial function. So too does she when adjudicating his case. If an

allegation that the former acts were carried out wrongfully can be the basis for federal criminal charges, then an allegedly wrongful directed verdict, or vacatur of the conviction of a noncitizen, might be challenged as "obstruction" by the government if it rendered the noncitizen no longer subject to removal. This concern is more than hypothetical. On April 17, 2019, the Office of the Administrative Judge for the Unified Court System of the State of New York issued a directive to uniformed personnel within New York. New York Office of the Chief Administrative Judge, Directive No. 1-2019, "Protocol Governing Activities in Courthouses by Government Agencies." The directive provides for limited voluntary cooperation with federal immigration authorities, but limits what state personnel may do, providing that "no law enforcement action may be taken by a [federal] law enforcement agency in a courtroom." *Id.* The protocol also directs a court officer to inform the judge "if a law enforcement agent covered by this protocol is present in the courthouse with the intent of arresting or otherwise taking into custody a party or other participant in a case before the judge," and prohibits arrests within a courthouse absent a warrant or order issued by a federal or magistrate judge. It would be a small step from Counts I-III of the Indictment to future prosecutions alleging that a state judge's compliance with New York's protocol, or with similar protocols in other states also constitutes obstruction of justice.

The typical means of commandeering is through legislating control. The commandeering deployed here is more potent and more cynical: intimidation by indictment. This case is notorious.[22] In every state, the pendency of this Indictment has since 2019 cast a coercive shadow over the exercise of state judicial power. Its mere pendency chills judicial officers in this Commonwealth and in other States, and raises a significant concern that the United States will engage in further acts of overreach. The "choice" here (cooperate with federal expectations or incur a federal criminal charge) is not a "choice," *see New York*, 505 U.S. at 176, 188, but rather, submission to the exercise of profound federal coercion. *Murphy*, 138 S. Ct. at 1477-78. Absent an order that the district court dismiss Counts I-III of the Indictment, those counts will announce to every judge in a State court that she must manage her courthouse in a manner that facilitates federal arrest, or risk professional humiliation, financial ruin, and prison.

## CONCLUSION

The order of the district court should be vacated, and the case remanded with instructions to dismiss Counts I-III of the Indictment.

---

[22] Press and other coverage has been widespread. *See* Appendix B.

By their attorneys,

/s/ Sabin Willett
_____

Sabin Willett (BBO #542519)
sabin.willett@morganlewis.com
Vanessa M. Brown (BBO #697097)
vanessa.m.brown@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110-1726
+1.617.341.7700

Dated:  November 30, 2020

# APPENDIX A

# Appendix A

Jennifer M. Chacón
Professor of Law
UCLA School of Law

Linus Chan
Associate Clinical Professor of Law
University of Minnesota

Erwin Chemerinsky
Dean and Jesse H. Choper
Distinguished
Professor of Law
University of California, Berkeley
School of Law

Alina Das
Professor of Clinical Law
Co-Director, Immigrant Rights
Clinic New York University
School of Law

Seth Davis
Professor of Law
University of California, Berkeley
School of Law

César Cuauhtémoc García Hernández
Associate Professor of Law
University of Denver

Dina Francesca Haynes
Professor of Law
Director Human Rights and
Immigration Law Project
New England Law School

Annie Lai
Co-Director, Immigrant Rights Clinic
Clinical Professor of Law
UC Irvine School of Law

Christopher N. Lasch
Professor of Law
University of Denver Sturm College
of Law

Elizabeth McCormick
Associate Dean for Experiential
Learning Associate Clinical
Professor of Law University of
Tulsa College of Law

Ilya Somin
Professor of Law
George Mason University Antonin
Scalia
Law School

Michael J. Wishnie
William O. Douglas Clinical
Professor of Law
Yale Law School

# APPENDIX B

<u>Appendix B</u>

At the time of the Indictment, press and other coverage was widespread.

*See* Indictment, *United States v. Joseph*, 133 Harv. L. Rev. 1129 (2020); Associated Press, *Massachusetts Judge Charged With Helping Man Evade ICE; State court judge indicted for allegedly helping man living in U.S. illegally to evade immigration authorities*, The Wall Street Journal Online, Apr. 25, 2019, https://www.wsj.com/articles/massachusetts-judge-charged-with-helping-man-evade-ice-11556224754; Associated Press, *Massachusetts judge charged with helping man evade immigration agent*, Los Angeles Times, Apr. 25, 2016, https://www.latimes.com/nation/la-na-massachusetts-judge-immigration-20190425-story.html; Ellen Barry, *When the Judge Became the Defendant*, The New York Times, Nov. 16, 2019, https://www.nytimes.com/2019/11/16/us/shelley-joseph-immigration-judge.html; Maria Cramer, *Low-profile judge, indicted for allegedly helping undocumented immigrant, finds herself in harsh spotlight*, The Boston Globe, May 21, 2019, https://www.bostonglobe.com/metro/2019/05/21/low-profile-judge-indicted-for-allegedly-helping-undocumented-immigrant-finds-herself-harsh-spotlight/PTHdKNcBoT59uEM1i8W55M/story.html; P.J. D'Annunzio, *Boston Judge, Ex-Court Officer Charged With Obstructing ICE Arrest*, Law.com, Apr. 25, 2019, https://www.law.com/2019/04/25/boston-federal-judge-ex-court-officer-charged-with-obstructing-ice-arrest/; Marina Fang, *Massachusetts Judge Charged With Helping Undocumented Immigrant Escape ICE*, HuffPost, Apr. 26, 2019, https://www.huffpost.com/entry/massachusetts-judge-immigrant-escape-ice_n_5cc2f995e4b08170696826f5; Claire Hansen, *Judge, Court Officer Charged in Immigrant's Escape From ICE Officer*, U.S. News, Apr. 25, 2019, https://www.usnews.com/news/national-news/articles/2019-04-25/judge-court-officer-charged-in-immigrants-escape-from-ice-officer; Kevin Johnson & Joey Garrison, *Feds charge Mass. judge with obstruction for aiding undocumented immigrant's escape from ICE*, USA Today, Apr. 25, 2019, https://www.usatoday.com/story/news/politics/2019/04/25/doj-charges-judge-obstruction-allowing-illegal-immigrant-escape-ice/3574450002; Aaron Leibowitz, *Mass. Judge Charged With Helping Man Escape ICE*, Law360, Apr. 25, 2019, https://www.law360.com/articles/1153572/mass-judge-charged-with-helping-man-escape-ice; Andrew Lelling, *Mass. Judge And A Retired Court Officer Face Charges After Defendant Evades ICE*, National Public Radio, Apr. 25, 2019, https://www.npr.org/2019/04/25/717187283/mass-judge-and-a-retired-court-officer-charged-with-helping-defendant-evade-

ice#:~:text=A%20Massachusetts%20judge%20and%20a%20former%20court%20
officer%20are%20facing,an%20immigration%20officer%20last%20year.&text=T
he%20two%20defendants%20pleaded%20not,Thursday%20afternoon%2C%20an
d%20were%20released; Pilar Melendez, *Judge Charged With Helping
Undocumented Immigrant Escape Court to Dodge ICE*, The Daily Beast, Apr. 25,
2019, https://www.thedailybeast.com/judge-shelley-richmond-joseph-charged-
with-helping-undocumented-immigrant-evade-ice; Toni Messina, *The Judge Who
Helped The Federal Fugitive*, Above the Law, Nov. 25, 2019,
https://abovethelaw.com/2019/11/the-judge-who-helped-the-federal-fugitive/;
Alanna Durkin Richer, *State judge charged with helping man evade immigration
agent*, Associated Press, Apr. 25, 2019,
https://apnews.com/article/0f3592d82aa14d4d8a0f6a3da59258d3; Amanda Robert,
*Judge faces obstruction of justice charges; ICE says she helped immigrant evade
courthouse arrest*, ABA Journal, Apr. 25, 2019,
https://www.abajournal.com/news/article/massachusetts-judge-charged-with-
obstruction-of-justice-over-ice-evasion; Transcript of World News Tonight at 12:13,
ABC News, Apr. 25, 2019, https://abc.com/shows/world-news-tonight/episode-
guide/2019-04/25-042519-quarantine-orders-issued-at-ucla; Transcript of News
Report, CNN Newsroom, Apr. 25, 2019,
http://www.cnn.com/TRANSCRIPTS/1904/25/cnr.07.html; Transcript of Tucker
Carlson Tonight, Fox News, Apr. 25, 2019,
https://www.foxnews.com/transcript/steyn-biden-is-unable-to-run-as-himself-in-
the-current-democratic-climate.

National interest in the case has persisted.

*See* Ellen Barry, *When the Judge Became the Defendant*, The New York
Times, Nov. 16, 2019, https://www.nytimes.com/2019/11/16/us/shelley-joseph-
immigration-judge.html; Maria Cramer & John R. Ellement, *SJC changes course,
orders judge facing federal charges to get $184,000 salary*, The Boston Globe, Aug.
13, 2019, https://www.bostonglobe.com/metro/2019/08/13/sjc-changes-course-and-
orders-judge-facing-federal-charges-get-
salary/hnFEvazC5uV5XamvYFt4aN/story.html; Emma Cueto, *Feds Defend
Charges That Judge Helped Man Escape ICE, Law360*, Oct. 21, 2019,
https://www.law360.com/articles/1211303/feds-defend-charges-that-judge-helped-
man-escape-ice; John R. Ellement, *Federal judge rejects defense motion to dismiss
obstruction charge against Newton district court judge*, The Boston Globe, July 28,
2020, https://www.bostonglobe.com/2020/07/28/metro/federal-judge-rejects-

defense-motion-dismiss-obstruction-charge-against-newton-district-court-judge/;
Joey Garrison, *Judge indicted for helping undocumented immigrant evade ICE wants pay during suspension*, USA Today, May 30, 2019, https://www.usatoday.com/story/news/nation/2019/05/30/judge-shelley-joseph-wants-pay-indicted-helping-undocumented-immigrant-evade-ice/1290020001/;
Joey Garrison, *Massachusetts judge allowed to keep $181K salary amid federal charges for obstructing ICE*, USA Today, Aug. 13, 2019, https://www.usatoday.com/story/news/nation/2019/08/13/ice-obstruction-case-judge-can-keep-salary/1996936001/; Carma Hassan & Holly Yan, *A judge accused of helping an undocumented immigrant evade ICE will be paid during her suspension*, CNN Wire, Aug. 13, 2019, https://www.cnn.com/2019/08/13/us/massachusetts-judge-suspended-with-pay/index.html; William J. Kole, *Judge accused of aiding wanted immigrant gets pay restored*, Associated Press, Aug. 13, 2019, https://apnews.com/article/c719c2c68281465bacbe08eb089d65f8; Aaron Leibowitz, *Mass. Judge Accused Of Obstructing ICE Gets Pay Restored*, Law360, Aug. 13, 2019, https://www.law360.com/articles/1188167/mass-judge-accused-of-obstructing-ice-gets-pay-restored; Toni Messina, *The Judge Who Helped The Federal Fugitive*, Above the Law, Nov. 25, 2019, https://abovethelaw.com/2019/11/the-judge-who-helped-the-federal-fugitive; Nate Raymond, *Mass. judge seeks to dismiss 'unprecedented' ICE arrest obstruction charges*, Reuters Legal, June 11, 2020, https://www.reuters.com/article/immigration-massachusetts/mass-judge-seeks-to-dismiss-unprecedented-ice-arrest-obstruction-charges-idUSL1N2DO2JH; Alanna Durkin Richer, *Judge accused of aiding wanted immigrant wants pay restored*, Associated Press, June 26, 2019, https://apnews.com/article/ce93bff041234e2e8577001dd08df92a; Alanna Durkin Richer, *Court won't toss case of judge charged in immigrant's escape, Associated Press*, July 27, 2020, https://apnews.com/article/state-courts-trials-immigration-massachusetts-courts-fdf6abeb7d38fcd0f22852316da2285b; Chantal da Silva, *Judge Accused of Helping Immigrant Escape ICE Through Court Back Door Sees Pay and Benefits Restored*, Newsweek, Aug. 14, 2019, https://www.newsweek.com/judge-pay-restored-after-accused-helping-immigrant-escape-ice-1454208; Robert Storace, *61 Retired Jurists Support Judge Charged With Helping Man Escape ICE Arrest*, Connecticut Law Tribune, Sept. 16, 2019, 61 Retired Jurists Support Judge Charged With Helping Man Escape ICE Arrest; Chris Villani, *Indicted Judge Wants Case Halted Amid 1st Circ. Appeal*, Law360, Aug.

31, 2020, https://www.law360.com/articles/1305990/indicted-judge-wants-case-halted-amid-1st-circ-appeal.

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 6,373 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

*/s/ Vanessa M. Brown*
Sabin Willett (BBO #542519)
sabin.willett@morganlewis.com
Vanessa M. Brown (BBO #697097)
vanessa.m.brown@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110-1726
+1.617.341.7700

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the United States Court of Appeals for the First Circuit via the CM/ECF system this 30th day of November, 2020, to be served on all counsel of record via ECF.

Dated: November 30, 2020        */s/ Vanessa M. Brown*
Sabin Willett (BBO #542519)
sabin.willett@morganlewis.com
Vanessa M. Brown (BBO #697097)
vanessa.m.brown@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110-1726
+1.617.341.7700